LINDSAY, Judge.
Parents of three minor children appeal from judgments in consolidated cases terminating their parental rights pursuant to LSA-R.S. 13:1601, and freeing the children for adoption.
The father, T.V., and the mother, S.V., make the following assignments of error: (1) the trial court erred in not appointing a curator to represent the parents in their dealings with the Department of Health and Human Resources (DHHR) and thus denying them due process; (2) the trial court erred in finding that the continued custody of the children in foster care was necessitated by the parents’ failure to find a suitable alternative placement; (3) the trial court erred in finding that every reasonable effort had been made to rehabilitate the parents and that these efforts had failed; (4) the trial court erred in finding that there was no reasonable expectation of the parents being rehabilitated; (5) the trial court erred in finding that the services offered by the state were rejected; and (6) the trial court erred in finding that expert testimony established that termination of parental rights and adoption are in the best interest of the children.
Finding these assignments of error to have no merit, we affirm the trial court judgment.
FACTS
T.Y. and S.Y., who are both mentally retarded, are the parents of four children. A judgment terminating their parental rights as to their oldest daughter was affirmed by this court in State in the Interest of C. V. v. T. V., 499 So.2d 159 (La.App. 2d Cir.1986), writ denied 500 So.2d 411 (La. 1986). The present litigation concerns the three youngest children: L.A.V., a daugh *1317 ter, born on January 26, 1983; S.A.Y., a daughter, born on October 4, 1984; and T.J.V., a son, born on November 19, 1985. Both daughters were removed from their parents’ custody on October 4, 1984, and were adjudicated children in need of care on October 22, 1984. Their brother was removed from parental custody on December 13,1985, and he was adjudicated a child in need of care on February 24,1986. Petitions for termination of parental rights pursuant to LSA-R.S. 13:1601 were filed as to the daughters on November 7, 1986 (No. 19,463-CAJ); and as to the son on December 8, 1986 (No. 19,464-CAJ). All three children had been in foster care since removal from their parents’ custody.
Because of their mental retardation and lack of parenting skills, the parents had long been receiving various forms of assistance from state agencies to assist them in caring for their children. Numerous meetings had taken place between the parents and representatives of the state agencies at which discussions were held and goals were set to assist the parents in fulfilling their parental roles in the care of their children. Service plan contracts were entered into in which the parents agreed to take the recommended steps necessary to achieve better child care for their children. Social workers from the Office of Human Development periodically checked on the family, as did public health nurses. Peggy St. Julian, their social worker from July, 1984 to August, 1985, went to their house twice a month to work with the parents on achieving goals set in their service plan contracts. Mary Thompson Mills, a program supervisor for Evergreen Community Service, was also involved in the efforts to teach the parents independent living skills. She often tried to be present at the same time as the homemaker from one of the state services, who tried to teach S.V., the mother, how to care for the children and how to clean house.
Ms. St. Julian and Ms. Mills testified and described the unsanitary condition of the family’s wooden house, which was owned by the father of T.Y. It had no bathtub or hot water heater, and raw sewage ran from under the house into the yard. Ms. Mills said that there were roaches in the refrigerator and that dirty clothes which smelled of urine lay about. She also said that the mother, S.V., was often confused and unable to remember instructions. Furthermore, S.V. was herself lacking in personal hygiene. Ms. Mills testified that it was difficult to teach S.V. to care for herself, much less the children. Even L.A.V.’s hair smelled of urine.
On October 4,1984, Ms. Mills went to the family’s home and found S.V. there alone with L.A.V., who was about eighteen months old. Ms. Mills determined that S.V., who was in an advanced stage of pregnancy with the couple’s third child, was in fact in labor. S.V. was able to describe how she felt, but was unaware that she was in labor. Ms. Mills took S.V. to the hospital, where S.A.V. was born. Both the baby and L.A.V. were taken from their parents’ custody that day. These children were placed in the custody of DHHR pursuant to the judgment rendered on October 22, 1984.
After these two children were removed, Ms. St. Julian continued her visits to the family home. The father, T.V., made efforts to repair some of the deficiencies in the house, such as repairing the roof and fixing a hole in the hall floor. The parents refused transportation services to take them to visit the children. Ms. St. Julian suggested that urban housing be considered, but T.V. refused, stating that he wanted to stay near his parents who lived in the same neighborhood. In general, she perceived an inability to learn child rearing skills.
Mr. Watson Armstrong later became the case worker on the family’s file. He began working with the family within days of the birth of their fourth child, T.J.V. The baby was born at home and was then transferred to a hospital with his mother. Before they were released from the hospital, Mr. Armstrong went to inspect the family *1318 home. He found that the condition of the house had improved. It appeared clean and he did not see any bugs. However, the hot water heater and the bathtub had not been installed, and the problems with the raw sewage continued.
On December 13, 1985, Mr. Armstrong received a call from the health unit. Nurse Debbie Vogel had been to the house. T.V. was not at home. The nurse found S.V. alone with T.J.V. The infant was propped up with a bottle in his mouth. The nurses had previously instructed S.V. not to leave the child with his bottle in this manner. He was soaking wet, his diaper obviously unchanged for a long period of time. The house was cold and there was no formula prepared for the child. The nurses had to assist S.V. in preparing the bottles and the formula, despite prior demonstrations on how to perform these activities. Not only did S.V. not know how to properly hold the baby, she was unable to properly take her own medication.
In response to Nurse Vogel’s report, Mr. Armstrong immediately went to the house. He found the child lying on a sofa sucking on an empty bottle. S.V. was sitting on another sofa. T.V. still had not returned and S.V. did not know where he was. The child was taken from his parents’ custody that night and placed in foster care. His custody was granted to DHHR by the judgment of February 24, 1986.
Mr. Armstrong said that he made three to four visits to the family home after February, 1986. While the condition of the house was better, the problems with the raw sewage and the lack of hot water remained. At their last conference, T.V. told him to do what was best for the children, even if it meant adoption, just so long as he and S.V. could stay together.
Although the petitions for termination of parental rights were drafted in terms of LSA-R.S. 13:1601(D), which deals with abuse or neglect, the district court, sitting as a juvenile court, found that the state had carried its burden of proving by clear and convincing evidence all of the factors enumerated in LSA-R.S. 13:1601(F). These factors are:
F. (1) The child has been in the custody of the Department of Health and Human Resources for a period of at least one year pursuant to a court order.
(2) The child was removed from the custody of his parent because of the parent’s mental illness, mental retardation, or substance abuse; and such condition was so profound that it rendered the parent incapable of exercising parental responsibilities without exposing the child to a substantial risk of serious harm.
(3) The continued custody of the child was necessitated by the parent’s failure or refusal to effect a suitable alternative placement of the child other than foster care.
(4) Every reasonable effort has been made under the circumstances to rehabilitate the parent and such efforts have failed.
(5) There is no reasonable expectation of the parent being rehabilitated.
(6) Expert testimony established that termination of parental rights and adoption are in the child’s best interest.
The hearing on the petitions to terminate parental rights was held on May 4, 1987. The trial court found that the case was not one of financial need, but one which related to the parents’ lack of understanding, and their inability to carry out instructions or carry through on plans. The problems with the house had also resulted in neglect of the children. The state had made numerous efforts to rehabilitate the parents and continued until the case workers reached the conclusion that they had exhausted all reasonable efforts. The trial court further noted that the parents had refused certain services offered by the state. Finally, no suitable placement within the family was possible. Two relatives had failed the home studies which had been conducted to determine their suitability. An uncle who testified at trial was too old and financially unstable to provide long- *1319 term care. Based upon the trial court’s findings, it concluded that the state had borne its heavy burden of proof and it was in the best interest of the children that the parental rights of T.V. and S.Y. be terminated and that the children be freed for adoption. We have determined that the trial court was correct.
FAILURE TO APPOINT A CURATOR
As their first assignment of error, the parents argue that they were denied their rights to due process because neither the state nor the trial court caused them to be interdicted, and a curator appointed, following the findings of their mental retardation when they lost their parental rights to their first child. The parents contend that the curator could have then properly assisted them in their dealings with DHHR.
This contention was never presented to the trial court. The parents thus raise this issue for the first time on appeal, alleging merely that the state “could” have brought an interdiction proceeding against them for the limited purpose of assuring that they were adequately represented in their relations with DHHR.
The scope of appellate review is limited to “only issues which were submitted to the trial court and which are contained in specifications or assignments of error, unless the interest of justice clearly requires otherwise.” Rule 1-3, Uniform Rules— Courts of Appeal. Ordinarily, this issue could not be raised for the first time on appeal. However, because of the parents’ contention that their mental conditions may have placed them at a disadvantage in dealing with the DHHR, we believe that this issue should be considered in “the interest of justice.”
The articles on interdiction and cu-ratorship in the Civil Cede and the Code of Civil Procedure do not place a positive duty upon the DHHR to institute interdiction proceedings. LSA-C.C. Art. 390 authorizes the spouse and relatives of a person to petition for his interdiction. In the event of their inaction, interdiction “may” be sought by “any stranger or pronounced ex officio by the judge_” LSA-C.C. Art. 391. The latter provision contemplates there being a proceeding pending before the judge. Interdiction of Escat, 207 La. 228, 21 So.2d 43 (1945). Reference to the right of the judge to institute interdiction proceedings is not mentioned in LSA-C.C.P. Art. 4543, except to the extent he may be deemed “any other person.”
The parents claim that a curator could have worked with them and could have communicated with the DHHR concerning rehabilitation efforts. It is important to point out that the social workers assigned to the parents’ file actually performed the duties they claim would have been performed by a curator. Ms. St. Julian and the other workers were not adversary to the parents’ efforts to keep their children. In order to obtain potential custodians for the children, Mrs. St. Julian exhausted all possible relatives made known to her by the parents. She and Ms. Mills, among others, expended great effort in trying to assist the parents in providing a safe and sanitary home for the family. The parents have failed to demonstrate how a curator could have provided them with greater assistance.
We conclude that the parents have not been deprived of due process or “fundamental fairness.” They argue that the appointment of a curator would be of some value and would provide an additional procedural safeguard. Under the present facts, we cannot agree. Fundamental fairness does not require an interdiction and appointment of a curator to safeguard the rights of the parents prior to the institution of proceedings to terminate parental rights.
The functions that the curator would have carried out were adequately fulfilled by persons assigned by the DHHR to assist the parents. Once the proceedings against the parents were instituted, they were represented by counsel who safeguarded their interests throughout the proceedings and at trial. The state has adopted a compre *1320 hensive procedure to reduce the risk of erroneous deprivation of parental rights and to afford due process. LSA-R.S. 13:1600, et seq.; State in Interest of A.E., 448 So.2d 183 (La.App. 4th Cir.1984). This statutory scheme has special provisions for mentally retarded parents, which require the state to prove several specific circumstances before termination of parental rights may be ordered. LSA-R.S. 13:1601(F). The parents have been afforded due process.
This assignment of error is meritless.
PARENTS’ FAILURE TO EFFECT SUITABLE ALTERNATIVE PLACEMENT
The parents contend that the trial court erred in finding that the state was forced to continue custody of the children in foster care prior to the institution of these proceedings because of the parents’ failure to effect a suitable alternative placement of the children. Basically, they claim that their limited intelligence prevented them from aiding the state in seeking other relatives who could care for the children, and that they should not be penalized as a result.
Two out-of-state relatives, T.V.’s mother and a paternal great aunt, were suggested by T.V. as possible alternatives to foster care. However, home studies were conducted, and placement in these homes was found to be unsuitable. At trial, a parental uncle of T.V.’s, who had never been suggested to the state as a possible custodian, testified that he would be willing to care for the children. However, the uncle was 62 years old, and was in a less than financially stable position. He lived in a house with four completed and two uncompleted rooms. In addition to himself, the uncle’s household included his wife, her brother, a son, and occasionally a grandson. His income consisted of $430 per month in disability social security, and he said he was paying on notes at the bank.
The trial court found that the uncle could not provide long-term care for the children, and that it would not be in the best interest of the children to place them with the uncle in view of his personal situation and financial condition.
The parents claim the trial court overlooked the uncle’s ownership of more than fifty acres of land, the possibility of federal or state assistance, and T.V.’s ability to assist his uncle. Given the uncle’s indebtedness to the bank, and the uncertainty of the other factors, we agree with the trial court’s evaluation. The trial judge was in the best position to appraise the uncle’s stability, given his personal observation of the witness.
The parents’ contend that their limited intelligence rendered them unable to assist the state in locating other relatives. In this connection, we note T.V.’s explanation for not suggesting his uncle as a custodian at an earlier time when a home study could have been conducted. He said “I didn’t figure it could do any good, you know, so I just kept my mouth shut.” It appears he understood what was transpiring, but chose not to provide the information to the state. While he may have chosen to do so because of his feelings of futility, he nontheless made a conscious decision to refuse to provide the information.
The parents also argue that because of their limited intelligence they could not be expected to understand that failure to provide names of their relatives, or otherwise cooperate with the case workers, would result in the loss of their children. Inasmuch as this is not the first time these parents have faced termination of their parental rights, we find this argument less than persuasive.
Consequently, we cannot say that the trial court erred in finding that the continued custody of the children in foster care was necessitated by the parents’ failure or refusal to effect suitable alternative placement. LSA-R.S. 13:1601(F)(3).
REHABILITATION OF PARENTS
Assignments of error 3, 4 and 5 each relate to the efforts of the various *1321 state agencies to rehabilitate the parents. Assignment number 3 addresses the trial court finding that every reasonable effort had been made under the circumstances to rehabilitate them and that such efforts failed. Assignment number 4 questions the trial court finding that there was no reasonable expectation that the parents could be rehabilitated, and assignment number 5 deals with the finding that certain state services were rejected by the parents.
The record reveals that the parents received the benefit of numerous social services. These included the supervision and assistance provided by social workers. Additionally, homemakers gave demonstrations and provided assistance with child care and housekeeping, while health unit nurses assisted with nutritional guidance and child care advice. Furthermore, the parents had received this assistance for a number of years, all to little or no avail. Several service plan contracts were entered into, establishing goals to learn child care and basic housekeeping. The parents showed, at best, minimal ability to achieve these goals or to retain any instruction on child rearing.
The parents argue that the state failed to supply a plumber who could have corrected several problems at the house, such as connection of the hot water heater and the bathtub. However, we believe the state’s failure in this regard is not controlling. Had a plumber been provided, this would have merely been a temporary Band-Aid on a much larger problem. The fundamental and overwhelming problem is the inability of the parents to learn child care skills. Their problems are compounded by their unwillingness to accept services from the Springhill Association for Retarded Children because T.V. felt this would be an admission that he and S.V. were mentally retarded. These services would have surely enhanced their capabilities to deal with their children and their environment.
The testimony of Ms. St. Julian, Ms. Mills, and Ms. Vogel, all of whom had extensive exposure to the parents, demonstrates to our satisfaction that the parents failed to benefit from these services. We take judicial notice of the pronouncement of this court in State in the Interest of C. V. v. T. V.,. supra, in which the parents’ rights to their oldest child were terminated. The parents’ first contact with these social services was in 1977 when they were unable to care for their oldest child. Despite the continuing intervention of the state, the parents have proved themselves to be just as unable to care for these children as they were to care for their first child.
Of great concern is T.V.’s inability to understand and comply with the instructions of numerous persons that he must not leave his wife alone with the children. Ms. St. Julian recounted an incident one summer when L.A.V. was an infant. She testified that when she arrived at the family home she found T.V. gone, S.V. asleep, and L.A.V. on the floor playing with broken, glass Christmas ornaments. Ms. Mills told of finding S.V. alone with L.A.V. when S.V. was in labor with either no memory or knowledge of her husband’s whereabouts. And both Ms. Vogel and Mr. Armstrong said that, on the date T.J.V. was taken from his parents, T.V. was absent during their respective visits. They found S.V. alone with T.J.V. in a cold house with no formula, when the child was drenched in his own urine.
Dr. Gerald Baker, a clinical psychologist, examined the parents and found them to be of marginal intelligence, with the father functioning on a slightly higher level. While Dr. Baker did not know the precise measures which had been taken by the state to assist the parents, he was cognizant that efforts had been made and that the parents had not profited from them. His opinion as to the possibility of any improvement was not optimistic. He said that the fact that they had not responded favorably to the state aid thus far showed that maintaining the children in their parent’s home was not warranted.
The parents cite State, DHHR in Interest of CAB v. EB, Jr., 504 So.2d 162 (La. *1322 App. 2d Cir.1987), in which this court found error in a trial court finding that a mother showed no reasonable expectation of reformation as required by LSA-R.S. 13:1601(A)(3). However, the case is distinguishable from the present one. That case concerned children being taken from their parents because of abuse. The mother was found to have committed no actionable offenses against her daughters, she had been fully cooperative, she showed signs of improvement, and further reformation was reasonable under the facts. While the parents in the present case have been cooperative to a large degree, they have made little substantial progress. Here the parents are handicapped by their limited intelligence. Intelligence being described by Dr. Baker as basically “static” or fixed, we have no such reasonable expectation of progress, particularly in view of the already expended efforts to assist them.
Another relevant matter is whether the parents refused to accept certain services from which they would have benefited. For example, the parents may have qualified for public housing and thus, improved the family’s living conditions. However, Ms. St. Julian testified that when she broached the subject, T.V. chose not to apply for the housing because he wanted to stay in the neighborhood close to his parents. She also testified that T.V. refused their transportation services to attend family team conferences and visitations with their children.
The parents contend that after the children were removed, no further services were offered to rehabilitate them. We note that Ms. St. Julian continued to visit the house twice a month after the children’s removal. Finally, however, after seeing that nothing was being accomplished, a decision was made to seek termination of parental rights, after which point rehabilitation was no longer an objective.
We cannot find fault with the state’s discontinuation of services under the circumstances. At intervals since the birth of the parents’ first child in 1977, the state had worked extensively with these parents. The efforts of the cases workers and nurses had met with only marginal success at best, and the parents were unable to learn child care skills. The state was not required to repeat vain efforts endlessly. By the time of the birth of the fourth child, the state had exhausted its efforts to assist the parents and had been forced to concede defeat in its rehabilitative attempts.
In light of the foregoing, we find no merit in the parents’ assignments of error number 3, 4, and number 5.
EXPERT TESTIMONY
The parents argue that Dr. Baker’s testimony established that it would be in the best interest of the children to keep them within the family. However, examination of Dr. Baker’s testimony reveals that his opinion was conditional in this regard. He stated that if there were family members who were able to properly care for the children, then keeping them in the family would be the first order of preference. However, if such placement was not available, then permanent foster care with visitation by the parents would not be in the best interest of the children. Considering the tender ages of the children, Dr. Baker said adoption was the only alternative.
The trial court correctly found that there were no suitable relatives who were available to care for the children. In view of that fact, and Dr. Baker’s testimony, we find no error in the trial court’s finding that termination of parental rights and adoption are in the best interest of these children.
DECREE
For the reasons cited above, we affirm the judgment of the trial court. To the extent permitted by law, all costs are assessed to the state.
AFFIRMED.